# EXHIBIT A

NITCHES INC (Form: 10-K/A, Received: 02/16/2005 15:22:42)

Page 1 of 64

# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## Form 10-K/A

AMENDMENT NO.1

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended August 31, 2004

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File Number 0-13851

## NITCHES, INC.
(Exact name of registrant as specified in its charter)

| California | 95-2848021 |
|---|---|
| (State of Incorporation) | (I.R.S. Employer Identification No.) |

10280 Camino Santa Fe
San Diego, California  92121
(Address of principal executive offices)  (Zip Code)

Registrant's telephone number: (858) 625-2633

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, no par value | NASDAQ SmallCap Market |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒  No ☐

NITCHES INC (Form: 10-K/A, Received: 02/16/2005 15:22:42)

Indicate by check mark whether the registrant is an accelerated filer (as defined in rule 12b-2 of the Exchange Act).
Yes ☐   No ☒

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

As of October 31, 2004, 1,171,169 shares of the Registrant's common stock were outstanding.

The aggregate market value of all equity held by non-affiliates of the Registrant as of the last business day of the most recently completed second fiscal quarter (February 29, 2004) based on the closing price of the Registrant's stock in the NASDAQ SmallCap Market on that date was $6,734,222.

**Documents Incorporated By Reference**

None

**Explanatory Note**

Nitches, Inc. (the "Company") is filing this Amendment No.1 to its Annual Report on Form 10-K for the year ended August 31, 2004 (the "Annual Report") to include that information under Part III of this Annual Report that was previously incorporated by reference from the Company's definitive proxy statement to be issued for the Company's 2004 annual meeting of shareholders. This Amendment No.1 does not reflect events occurring after the filing of the original Annual Report, or modify or update the disclosures therein in any way other than as described above.

NITCHES INC (Form: 10-K/A, Received: 02/16/2005 15:22:42)    Page 3 of 64

PART I

Item 1 - Business

*General*

Nitches, Inc. (the "Company" or "Nitches") has been in the wholesale clothing business since 1973, and imports finished garments manufactured to its specifications from approximately ten foreign countries. The Company sells all-cotton and cotton blend knit and woven clothing for female and male consumers. Retail customers include Belk, Coopers, Gottschalks, Kohl's, Mervyn's, Sears, Sheplers, Stein Mart, TJ Maxx, Tractor Supply, and Wal-Mart (Sam's Club). The Company sells garments to these and other retailers through its own sales force and through independent sales representatives. Nitches provides fashionable clothing to the popularly priced market segment that generally retails between $10 and $35 per item. The Company competes primarily on the basis of price, quality, the desirability of its fabrics and designs, and the reliability of its delivery and service.

For more than ten years, the apparel market has been marked by deflation and reduced profit margins in certain markets. The consolidation of retail stores among a small number of national chains has given these chains leverage to seek lower pricing and thereby reduce profit margins for suppliers such as the Company. The Company's response has been to discontinue product lines in areas where it does not believe it can maintain a reasonable profit margin and to develop products in categories that are underserved or where the Company has an advantage in sources of supply, design or distribution.

The Company currently owns a total of 35 federally registered trademarks. While trademarks owned by the Company have always been important to its marketing and competitive strategy, prior to 1995 they were not central factors influencing its sales. However, subsequent to its reorganization in fiscal year 1995, the Company's trademarks in women's sleepwear and western wear and men's casual wear have become more important in identifying its products. Sleepwear garments are produced in a variety of fabrics and styles, including robes, pajamas, nightshirts and nightgowns, which are sold under the Body Drama® label and retailers' private labels. Western wear shirts are sold primarily under the Company labels Adobe Rose® and Southwest Canyon®. Western jeans are sold under the label Posted® through a licensing agreement with a third party supplier. The Company sells men's wear under the Newport Blue® and The Skins Game® labels through agreements with third parties.

*Product Development and Design*

The Company develops merchandise lines for production and distribution in two principal ways:

**Private Label Marketing** – the Company works with major retailers in developing product lines which the Company then has manufactured and imported and which are generally sold under these retailers' private labels. The Company's sales personnel meet with buyers representing retailers who may specify products by style, fabric, and color. These buyers may provide samples to the Company or may select styles already available in Company showrooms. The Company has an established reputation for its ability to arrange for foreign manufacture on a reliable, expeditious and cost-effective basis.

**Branded Sales** – the Company develops its own lines of clothing styles which are displayed in Company showrooms and which are also shown to retailers by independent sales representatives. The Company creates original garment bodies (styles) and more importantly, produces garments with original fabric prints and designs. The Company responds to frequent style changes in women's and men's clothing by maintaining a program of evaluating current trends in style and fabric. In an effort to continually stay abreast of fashion trends, representatives of the Company shop at exclusive department and specialty stores in the United States, Europe, Japan and other countries that are known to sell merchandise with advanced styling direction. The Company also seeks input from selected customers. The Company then selects styles, fabrics, and colors that it believes reflect current fashion trends.

*Raw Materials*

A substantial majority of the clothing sold by the Company is made of 100% cotton, although the Company also utilizes cotton blends, polyester and rayon fabrics. All of these fabrics are readily available in most countries in which the Company contracts for production and are easily imported to those countries that do not have an internal supply of such fabric. The majority of the fabric that the Company uses comes from multiple sources of supply in China. The Company is not dependent on a single source of supply for fabric that is not readily replaceable.

*Quality Control*

Company representatives regularly visit manufacturers to inspect garments and monitor production facilities in order to assure timely delivery, maintain quality control and issue inspection certificates. Furthermore, through these representatives and independent inspectors from major retailers, the Company ensures that the factories the Company uses for production adhere to policies consistent with prevailing labor laws. A sample of garments from a percentage of each production run is inspected before each shipment. Letters of credit arranged by the Company require, as a condition to the release of funds to the supplier, that a representative of the Company sign an inspection certificate.

*Marketing and Distribution*

   The Company sells its products through an established sales network consisting of both in-house sales personnel and independent sales representatives. The Company does not generally advertise, although customers sometimes feature the Company's products in their advertisements. For both Company Brand and Private Label sales, employees operating in Company showrooms in New York City and Los Angeles represent the Company in soliciting orders nationally from approximately eight (8) major customers. In addition, senior managers of the Company have primary responsibility for sales to certain key accounts. The Company's products are also marketed by 54 independent commissioned sales representatives.

   Increasingly, major retail chains are limiting the apparel they carry to nationally branded merchandise. The term "nationally branded" generally refers to an apparel brand that is sold throughout the country and is supported by national marketing programs such as direct advertisements in magazines and newspapers. Although the Company does sell branded apparel under owned and licensed trademarks, none of these lines are considered national brands. As the trend towards national brands continues, the Company may face fewer retail channels for the distribution of its products, leading to a decline in sales, or be forced to support its brands through national marketing programs, requiring an increase in expenditures.

   Most garments are shipped by suppliers in bulk form to the Company's warehouse in San Diego, where they are sorted, stored and packed for distribution to customers. From time to time, the Company may rent additional short-term warehouse space as needed to accommodate its requirements during peak shipping periods. In addition, to facilitate shipping to customers, some of its overseas suppliers perform sorting, price ticketing, hanging, and packing functions.

   Purchase orders may be canceled by the Company's customers in the event of late delivery or in the event of receipt of nonconforming goods. Late deliveries usually are attributable to production or shipping delays beyond the Company's control. In the event of canceled purchase orders, rejections or returns, the Company will sell garments to other retailers, off-price discount stores or garment jobbers. In the past the Company has often been able to recover from its manufacturers some portion of its expenses or losses associated with sales below cost for causes attributable to manufacturing problems. However, the Company has also historically experienced losses on merchandise that is rejected or returned. Yet past losses on rejected and returned merchandise have not been material to the Company.

   The Company's business is concentrated on certain significant customers. Sales to Wal-Mart (Sam's Club) and Kohl's accounted for 32.3% and 31.3%, respectively, of the Company's net sales during fiscal 2004. Kohl's, Mervyn's, and Sears accounted for 29.2%, 16.9% and 6.5%, respectively, of the Company's net sales



NITCHES INC (Form: 10-K/A, Received: 02/16/2005 15:22:42) Page 8 of 64



in fiscal 2003. While the Company believes its relationships with its major customers are good, because of competitive changes and availability of the types of garments sold by the Company from a number of other suppliers, there is the possibility that any customer could alter the amount of business it does with the Company. If the Company experiences a significant decrease in sales to any of its major customers, and is unable to replace such sales volume with sales to other major customers, there could be a material adverse financial effect on the Company.

4

NITCHES INC (Form: 10-K/A, Received: 02/16/2005 15:22:42)

Page 13 of 64

* Designer Intimates sells robes, loungewear, and sleepwear under its owned label of Anne Lewin. It also sells similar product lines under distribution and licensing agreements. The brands that these include are Argentovivo, Princess Tam Tam, Crabtree & Evelyn, Bill Blass Lifestyle, Dockers, and Vasserette. In addition, private label product is sold to such major retailers as Victoria Secret, JCPennys, and The Disney Stores.

There are additional disclosures regarding this investment in the Equity Investment discussion on page 11 and page 26 presents condensed financial statements for Designer Intimates.

*Cautionary Statement Under the Private Securities Litigation Reform Act of 1995*

Statements in the annual report on Form 10-K under the caption "Business", as well as oral statements that may be made by the Company or by officers, directors or employees of the Company acting on the Company's behalf, that are not historical fact constitute "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements involve known and unknown risks and uncertainties that may cause the Company's actual results to differ materially from forecasted results. Those risks include a softening of retailer or consumer acceptance of the Company's products, pricing pressures, competitive forces, worldwide political instability, or unanticipated loss of a major customer. In addition, the Company's business, operations and financial condition are subject to reports and statements filed from time to time with the Securities and Exchange Commission.

**Item 2 - Properties**

The Company currently leases properties in New York, California and Hong Kong. The Company leases one showroom in New York, one in Los Angeles and approximately 30,000 square feet of warehouse with administrative offices in San Diego. The Company may lease additional short-term warehouse space from time to time as needed.



**Item 3 - Legal Proceedings**

By letter dated December 6, 2004, the Company, together with Steve Wyandt and Paul Wyandt, were served notice by the U.S. Department of Labor that a complaint has been filed with the office of Occupational Safety & Health Administration by Angel Martin Aquino alleging discriminatory employment practices in violation of Section 806 of the Corporate and Criminal Fraud Accountability Act of 2002 (also known as the Sarbanes-Oxley Act). OSHA has not yet spoken with, or received any information from, the Company or Messrs. Steve or Paul Wyandt, and the December 6 letter indicates that OSHA has not yet determined whether an investigation of this matter is appropriate. Mr. Aquino was retained by the Company earlier this year to provide consulting services to the Company. Mr. Aquino is seeking alleged actual and compensatory damages of $43,000 and $300,000, respectively. The Company believes that the claims asserted by Mr. Aquino are without merit and intends to vigorously defend against such claims.

**Item 4 - Submission of Matters to a Vote of Security Holders**

There were no matters submitted to a vote of security holders during the fourth quarter of fiscal 2003.

7